Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

BARNEY GUARINO, derivatively on behalf of FATE THERAPEUTICS, INC.,

　　　　Plaintiff,

　　v.

SCOTT WOLCHKO, EDWARD J. DULAC III, SHEFALI AGARWAL, TIMOTHY P. COUGHLIN, ROBERT S. EPSTEIN, ROBERT HERSHBERG, KARIN JOOSS, MICHAEL LEE, JOHN MENDLEIN, WILLIAM RASTETTER, and YUAN XU,

　　　　Defendants,

　　and

FATE THERAPEUTICS, INC.,

　　　　Nominal Defendant.

Case No.: **'23 CV 1033 WQH BLM**

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Barney Guarino ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Fate Therapeutics, Inc. ("Fate" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Scott Wolchko ("Wolchko"), Edward J. Dulac III ("Dulac"), Shefali Agarwal ("Agarwal"), Timothy P. Coughlin ("Coughlin"), Robert S. Epstein ("Epstein"), Robert Hershberg ("Hershberg"), Karin Jooss ("Jooss"), Michael Lee ("Lee"), John Mendlein ("Mendlein"), William Rastetter ("Rastetter"), and Yuan Xu ("Xu") (collectively, the "Individual Defendants" and with Fate, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Fate, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fate, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Fate's directors and officers from April 2, 2020 through January 5, 2023 (the "Relevant Period").

2.     Fate is a Delaware corporation based in San Diego, California that focuses on bringing programmed cellular immunotherapies to patients with cancer and autoimmune disorders.

3.     On April 2, 2020, after market hours, Fate issued a press release wherein it announced that it was entering into a global collaboration and option agreement with Janssen Biotech, Inc. ("Janssen") for cell-based cancer immunotherapies (the "Collaboration Agreement").  Janssen is part of Janssen Pharmaceuticals Companies, which is owned by Johnson & Johnson. The Collaboration Agreement provided Fate with a $50 million upfront payment, along with the eligibility to receive up to $3 billion in milestone payments and double-digit royalties on any net sales from the collaboration.

4.     On this news, the Company's stock price surged 8.8% in trading on April 3, 2020.

5.     On January 5, 2023, after market hours, Fate issued a press release revealing that the Company had terminated the Collaboration Agreement. The press release stated that Fate was "not able to align with Janssen on their proposal for continuation of our collaboration, where two product candidates targeting high-value, clinically-validated hematology antigens were set to enter clinical development in 2023[.]" As a consequence of the termination, the Company further revealed that it would have to (1) cut its workforce to approximately 220 employees in the first quarter of 2023 and (2) discontinue several of its natural cell killer programs in various cancers, including FT516 and FT538 NK cell programs in acute myeloid leukemia, FT516 and FT596 NK cell programs in B-cell lymphoma, and FT538 and FT536 NK cell programs in solid tumors. Fate also disclosed that the termination of the Collaboration Agreement meant that all licenses and other rights granted pursuant to the Collaboration Agreement would terminate.

6.     On this news, the price per share of the Company's common stock fell $6.76, or 61.45%, from a closing of $11.00 per share on January 5, 2023 to close on January 6, 2023 at $4.24 per share.

7.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Collaboration Agreement was far less viable than Fate had represented to investors and the public; (2) consequently, several of the clinical programs, milestone payments, and royalty payments pertaining to the Collaboration Agreement could not be expected to provide future revenue sources for Fate; (3) as a result, Fate exaggerated the Collaboration Agreement's overall long-term medical and economic benefits; and (4) due to the aforementioned conduct, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while during the Relevant Period, seven of the Individual Defendants sold Company shares at inflated prices.

9.     Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

10.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO")/President, and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of California (the "Securities Class Action") and

Verified Shareholder Derivative Complaint

which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the CEO/President's and CFO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

Verified Shareholder Derivative Complaint

16.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

18.     Venue is proper in this District because Fate and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Fate. Plaintiff has continuously held Company common stock at all relevant times.

### Nominal Defendant Fate

20.     Fate is a Delaware corporation with its principal executive offices at 12278 Scripps Summit Drive, San Diego, CA 92131. Fate common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "FATE."

### Defendant Wolchko

21.     Defendant Wolchko has served as Fate's CEO and President since December 2015 and as a director since October 2015. Previously, he served as CFO from September 2007 until August 2020. Therefore, he has been an officer of the Company since its inception. According to the proxy statement that the Company filed with the SEC on April 21, 2023 (the "2023 Proxy Statement"), as of March 31, 2023, Defendant Wolchko beneficially owned 261,048 shares of the Company's common stock, representing approximately 1.66% of the Company's outstanding shares. Given that the

5

price per share of the Company's common stock at the close of trading on March 31, 2023 was $5.70, Defendant Wolchko owned approximately $1,487,974 worth of Fate stock.

22.    For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Wolchko received $8,145,000 in total compensation from the Company. This included $645,000 in salary and $7,500,000 in option awards. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Wolchko received $11,728,617 in total compensation from the Company. This included $610,000 in salary, $9,552,617 in stock awards, $1,200,000 in option awards, and $366,000 in non-equity incentive plan compensation. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Wolchko received $5,600,167 in total compensation from the Company. This included $570,000 in salary, $1,451,340 in stock awards, $3,222,577 in option awards, and $356,250 in non-equity incentive plan compensation.

23.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Wolchko made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 12, 2020 | 30,000 | $53.18 | $1,595,430 |
| November 13, 2020 | 30,000 | $51.03 | $1,530,900 |
| December 17, 2020 | 20,000 | $92.28 | $1,845,660 |
| January 8, 2021 | 60,820 | $116.33 | $7,075,008 |
| January 11, 2021 | 8,587 | $110.68 | $950,374 |
| January 21, 2021 | 30,000 | $103.59 | $3,107,850 |
| January 22, 2021 | 30,000 | $98.76 | $2,962,830 |
| February 18, 2021 | 20,000 | $101.28 | $2,025,600 |
| April 22, 2021 | 30,000 | $85.54 | $2,566,200 |
| April 23, 2021 | 30,000 | $85.24 | $2,557,290 |
| May 20, 2021 | 20,000 | $77.17 | $1,543,300 |
| July 22, 2021 | 30,000 | $86.16 | $2,584,770 |
| July 23, 2021 | 30,000 | $85.28 | $2,558,550 |

| August 19, 2021 | 20,000 | $88.01 | $1,760,200 |
| October 21, 2021 | 30,000 | $60.23 | $1,806,750 |
| October 22, 2021 | 30,000 | $58.88 | $1,766,400 |
| November 18, 2021 | 20,000 | $54.27 | $1,085,400 |
| January 10, 2022 | 34,156 | $47.08 | $1,608,166 |
| January 11, 2022 | 14,566 | $48.78 | $710,602 |
| January 20, 2022 | 30,000 | $40.21 | $1,206,300 |
| January 21, 2022 | 10,000 | $38.02 | $380,200 |
| April 21, 2022 | 30,000 | $36.23 | $1,086,750 |
| April 22, 2022 | 10,000 | $34.84 | $348,450 |
| July 21, 2022 | 30,000 | $32.80 | $984,150 |
| July 22, 2022 | 6,246 | $32.41 | $202,414 |

Thus, in total, before the fraud was exposed, he sold 634,375 shares of Company stock on inside information, for which he received approximately $45,849,544 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

24.     The 2023 Proxy Statement stated the following about Defendant Wolchko:

***J. Scott Wolchko*** has served as our President and Chief Executive Officer since December 2015, as a director since October 2015, and as our Chief Operating Officer since February 2013. Mr. Wolchko also served as our Chief Financial Officer from the commencement of our operations in September 2007 until August 2020. Mr. Wolchko began his career in 1994 as an investment banker with Morgan Stanley & Co., serving in the firm's New York City and Menlo Park, California offices. As a member of the firm's Investment Banking Health Care Group, he assisted emerging growth companies in the life sciences sector complete capital-raising and M&A transactions. Prior to joining us, from July 2001 to September 2007, Mr. Wolchko served as the Chief Financial Officer of Bocada, Inc., an enterprise software company that specializes in data protection management. Mr. Wolchko holds an M.S. in biochemical engineering from the University of Virginia, and a B.S. in biomedical engineering from the University of Vermont.

The Board of Directors believes Mr. Wolchko's extensive leadership, executive, managerial, business and healthcare industry experience qualifies

him to serve as a member of our Board of Directors. In addition, Mr. Wolchko's day-to-day management and intimate knowledge of our business and operations provide our Board with an in-depth understanding of the Company.

**Defendant Dulac**

25.     Defendant Dulac has served as CFO since August 2020. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Dulac beneficially owned 15,946 shares of the Company's common stock, representing less than 1% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $5.70, Defendant Dulac owned approximately $90,892 worth of Fate stock.

26.     For the 2022 Fiscal Year, Defendant Dulac received $3,157,751 in total compensation from the Company. This included $455,000 in salary, $1,327,751 in stock awards, and $1,375,000 in option awards. For 2021 Fiscal Year, Defendant Dulac received $6,384,051 in total compensation from the Company. This included $420,000 in salary, $5,296,051 in stock awards, $500,000 in option awards, and $168,000 in non-equity incentive plan compensation. For the 2020 Fiscal Year, Defendant Dulac received $5,683,579 in total compensation from the Company. This included $142,500 in salary, $137,917 in bonuses, $1,420,800 in stock awards, $3,786,529 in option awards, $75,833 in non-equity incentive plan compensation, and $120,000 in all other compensation.

27.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Dulac made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| August 19, 2021 | 3,474 | $88.85 | $308,664 |
| September 28, 2021 | 19,460 | $62.53 | $1,216,833 |
| December 20, 2021 | 15,977 | $60.00 | $958,620 |
| January 11, 2022 | 1,770 | $48.70 | $86,207 |
| August 18, 2022 | 5,135 | $30.08 | $154,460 |

Thus, in total, before the fraud was exposed, he sold 45,816 shares of Company stock on inside information, for which he received approximately $2,724,784 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

28.     The 2023 Proxy Statement stated the following about Defendant Dulac:

***Edward J. Dulac III***, has served as our Chief Financial Officer since August 2020. Prior to joining Fate, Mr. Dulac held roles of increasing responsibility across business development, strategy and marketing at Celgene, a global biopharmaceutical company based in Summit, New Jersey. From May 2017 to February 2020, Mr. Dulac led licensing and acquisitions as Vice President of Business Development & Strategy, and from April 2016 to May 2017 he served as Head of Portfolio Analytics & Strategy at Celgene. Mr. Dulac held additional positions at Celgene including Senior Director of Business Development, and Director of Global Marketing from 2012 to 2016. From 2007 to 2012, Mr. Dulac was a biopharmaceutical analyst at Lehman Brothers Holdings Inc. and Barclays Capital Inc., prior to which he worked in corporate finance at Pfizer Inc. Mr. Dulac began his career as a retail pharmacist after earning his B.S. in Pharmacy from the University of Pittsburgh. He also holds an M.B.A. from the Kelley School of Business at Indiana University.

**Defendant Agarwal**

29.     Defendant Agarwal has served as a Company director since July 2019. She also serves as a member of the Nominating and Corporate Governance Committee and as the chair of the advisory Science & Technology Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Agarwal beneficially owned 1,840 shares of

the Company's common stock, representing less than 1% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $5.70, Defendant Agarwal owned approximately $10,488 worth of Fate stock.

30.     For the 2022 Fiscal Year, Defendant Agarwal received $460,094 in total compensation from the Company. This included $57,000 in fees earned or paid in cash, $203,102 in stock awards, and $199,992 in option awards. For the 2021 Fiscal Year, Defendant Agarwal received $440,924 in total compensation from the Company. This included $56,125 in fees earned or paid in cash, $184,828 in stock awards, and $199,971 in option awards. For the 2020 Fiscal Year, Defendant Agarwal received $333,474 in total compensation from the Company. This included $52,333 in fees earned or paid in cash and $281,141 in option awards.

31.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Agarwal made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| June 3, 2022 | 807 | $22.80 | $18,399 |
| June 7, 2022 | 841 | $21.89 | $18,409 |

32.     Thus, in total, before the fraud was exposed, she sold 1,648 shares of Company stock on inside information, for which she received approximately $36,808 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

33.     The 2023 Proxy Statement stated the following about Defendant Agarwal:

**Dr. Shefali Agarwal** has served as a director since July 2019. Dr. Agarwal currently serves as the President and Chief Executive Officer and Chair of the Board of Directors of Onxeo S.A. ("Onxeo"), a clinical stage

biotechnology company developing drugs targeting DNA Damage Response, where she has served as Chair of the Board of Directors since June 2021. Prior to her appointment as President and Chief Executive Officer of Onxeo in April 2022, Dr. Agarwal was the Executive Vice President, Chief Medical and Development Officer of Epizyme, Inc., a clinical-stage company developing novel epigenetic therapies for cancer and other serious diseases, where she led the global clinical development and regulatory strategy for tazemetostat for the treatment of cancer from July 2018 to April 2022, and continues to serve as a senior medical advisor and interim Chief Medical and Development Officer. Prior to joining Epizyme in July 2018, Dr. Agarwal served as Chief Medical Officer at SQZ Biotech Inc. between July 2017 and May 2018, where she built and led the clinical development organization, which included clinical research operations and regulatory functions. Dr. Agarwal has also held senior leadership positions at Curis, Inc. from July 2016 to July 2017, where she oversaw the Phase 2 study of its dual HDAC/PI3K inhibitor in diffuse large B-cell lymphoma, and at Tesaro, Inc. from July 2013 to February 2017, where she served as the clinical lead for the New Drug Application and the European Medicines Agency regulatory submissions and supported the commercial launch of ZEJULA® (niraparib) in ovarian cancer. She has also held positions at Covidien plc (acquired by Medtronic, Inc.), AVEO Oncology and Pfizer, and led clinical research in the Department of Anesthesiology and Critical Care Medicine at Johns Hopkins University. Dr. Agarwal received her master's degree in public health from Johns Hopkins University, her M.S. in business from the University of Baltimore, and her medical degree (M.B.B.S.) from Karnataka University.

The Board of Directors believes Dr. Agarwal is qualified to serve on our Board of Directors due to her extensive experience in the biotechnology industry.

**Defendant Coughlin**

34.    Defendant Coughlin has served as a Company director since August 2013. He also serves as the chair of the Audit Committee and as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Coughlin beneficially owned 57,632 shares of the Company's common stock, representing less than 1% of the Company's outstanding shares. Given that the price per

share of the Company's common stock at the close of trading on March 31, 2023 was $5.70, Defendant Coughlin owned approximately $328,502 worth of Fate stock.

35.     For the 2022 Fiscal Year, Defendant Coughlin received $464,094 in total compensation from the Company. This included $61,000 in fees earned or paid in cash, $203,102 in stock awards, and $199,992 in option awards. For the 2021 Fiscal Year, Defendant Coughlin received $445,549 in total compensation from the Company. This included $60,750 in fees earned or paid in cash, $184,828 in stock awards, and $199,971 in option awards. For the 2020 Fiscal Year, Defendant Coughlin received $341,141 in total compensation from the Company. This included $60,000 in fees earned or paid in cash and $281,141 in option awards.

36.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Coughlin made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| June 3, 2022 | 1,439 | $22.81 | $32,823 |

Thus, in total, before the fraud was exposed, he sold 1,439 shares of Company stock on inside information, for which he received approximately $32,823 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

37.     The 2023 Proxy Statement stated the following about Defendant Coughlin:

***Timothy P. Coughlin*** has served as a director since August 2013. Mr. Coughlin is the former Chief Financial Officer of Neurocrine Biosciences, Inc. ("Neurocrine"), a biopharmaceutical company that has received FDA approval for INGREZZA® (valbenazine) and ORILISSA® (elagolix), both of which were discovered and developed during his tenure at Neurocrine from 2002 to 2018. Mr. Coughlin serves on the board of directors of Travere Therapeutics, Inc. and aTyr Pharma, Inc., both biotechnology companies, and also served on the board of directors of

Peloton Therapeutics, Inc. prior to its sale to Merck in 2019. Prior to joining Neurocrine, he was with Catholic Health Initiatives, a nationwide integrated healthcare delivery system, where he served as Vice President of Financial Services. Mr. Coughlin also served as a Senior Manager in the Health Sciences practice of Ernst & Young LLP and its predecessors from 1989 to 1999. Mr. Coughlin holds a master's degree in international business from San Diego State University and a bachelor's degree in accounting from Temple University. Mr. Coughlin is a certified public accountant in both California and Pennsylvania.

The Board of Directors believes Mr. Coughlin is qualified to serve on our Board of Directors due to his extensive background in financial and accounting matters for public companies and his leadership experience in the biotechnology industry, including his tenure at Neurocrine.

**Defendant Epstein**

38.  Defendant Epstein has served as a Company director since March 2014. He also serves as the chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Epstein beneficially owned 2,681 shares of the Company's common stock, representing less than 1% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $5.70, Defendant Epstein owned approximately $15,282 worth of Fate stock.

39.  For the 2022 Fiscal Year, Defendant Epstein received $460,594 in total compensation from the Company. This included $57,500 in fees earned or paid in cash, $203,102 in stock awards, and $199,992 in option awards. For the 2021 Fiscal Year, Defendant Epstein received $441,549 in total compensation from the Company. This included $56,750 in fees earned or paid in cash, $184,828 in stock awards, and $199,971 in option awards. For the 2020 Fiscal Year, Defendant Epstein received $333,308 in total compensation from the Company. This included $52,167 in fees earned or paid in cash and $281,141 in option awards.

40.  The 2023 Proxy Statement stated the following about Defendant Epstein:

***Robert S. Epstein, M.D., M.S.*** has served as a director since March 2014. Dr. Epstein is an epidemiologist and strategic consultant to life sciences companies and serves as a director on the boards of Veracyte, Inc., a molecular diagnostic company, and Illumina, Inc., a life sciences company. From August 2010 to April 2012, Dr. Epstein served as President of the Medco-UBC Division and Chief Research and Development Officer of Medco Health Solutions, Inc. ("Medco"), a managed healthcare company. In this role, Dr. Epstein was responsible for all of Medco's clinical research initiatives, including the Medco Research Consortium and United BioSource Corporation. Dr. Epstein served as Senior Vice President and Chief Medical Officer from 1997 to August 2010 at Medco and was appointed President of the Medco Research Institute in 2009. Before joining the private sector, Dr. Epstein was trained as an epidemiologist and held various positions in public health and academia. He is a past elected President of the International Society of Pharmacoeconomics and Outcomes Research and has served on the board of directors for the Drug Information Association. In 2008, Dr. Epstein was nominated and elected to the Federal CDC EGAPP (Evaluation of Genomic Applications in Practice & Prevention) Stakeholder Committee, and the AHRQ CERT (Centers for Education and Research on Therapeutics) Committee. Dr. Epstein holds a B.S. and an M.D. from the University of Michigan and an M.S. from the University of Maryland.

The Board of Directors has determined that Dr. Epstein's extensive operating, commercial, and senior management experience in the biotechnology industry, as well as his expertise in health economics, qualifies him to serve as a member of our Board of Directors.

**Defendant Hershberg**

41.     Defendant Hershberg has served as a Company director since May 2020. He also serves as a member of the Nominating and Corporate Governance Committee and as a member of the advisory Science & Technology Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Hershberg beneficially owned 2,009 shares of the Company's common stock, representing less than 1% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $5.70, Defendant Hershberg owned approximately $11,451 worth of Fate stock.

42. For the 2022 Fiscal Year, Defendant Hershberg received $454,094 in total compensation from the Company. This included $51,000 in fees earned or paid in cash, $203,102 in stock awards, and $199,992 in option awards. For the 2021 Fiscal Year, Defendant Hershberg received $435,174 in total compensation from the Company. This included $50,375 in fees earned or paid in cash, $184,828 in stock awards, and $199,971 in option awards. For the 2020 Fiscal Year, Defendant Hershberg received $735,185 in total compensation from the Company. This included $32,333 in fees earned or paid in cash and $702,852 in option awards.

43. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hershberg made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| June 3, 2022 | 672 | $22.75 | $15,288 |

Thus, in total, before the fraud was exposed, he sold 672 shares of Company stock on inside information, for which he received approximately $15,288 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

44. The 2023 Proxy Statement stated the following about Defendant Hershberg:

***Robert Hershberg, M.D., Ph.D.*** has served as a director since May 2020. Dr. Hershberg has served as the Chief Executive Officer, President and Chair of the Board of HilleVax, Inc. ("Hillevax") since January 2021 and is currently a Venture Partner at Frazier Healthcare Partners since March 2020. He also served as the Executive Vice President and Head of Business Development and Global Alliances at Celgene Corporation ("Celgene"), a global biopharmaceutical company (acquired by Bristol-Myers Squibb in 2019) from April 2017 to March 2020. He was employed in positions of ascending responsibility at Celgene since joining the company in 2014 including his role as Chief Scientific Officer. Prior to Celgene,

Dr. Hershberg served several roles at VentiRx Pharmaceuticals, a clinical-stage biopharmaceutical company which he co-founded in 2006, and was Chief Executive Officer from September 2012 until the company's acquisition by Celgene in February 2017. Dr. Hershberg currently serves on the board of directors of Adaptive Biotechnology, Recursion Therapeutics, and Hillevax (where he serves as chief executive officer). He is also an independent board member of Cajal Neuroscience, a privately held company. He holds a Ph.D. in biology from the University of California, San Diego's Affiliated Ph.D. program with the Salk Institute and an M.D. and Bachelor's degree from the University of California, Los Angeles.

The Board of Directors believes that Dr. Hershberg is qualified to serve on our Board of Directors due to his broad leadership experience on various boards and his leadership experience in the biotechnology industry.

**Defendant Jooss**

45.    Defendant Jooss has served as a Company director since March 2019. She also serves as chair of the Compensation Committee and as a member of the advisory Science & Technology Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Jooss beneficially owned 1,198 shares of the Company's common stock, representing less than 1% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $5.70, Defendant Jooss owned approximately $6,829 worth of Fate stock.

46.    For the 2022 Fiscal Year, Defendant Jooss received $455,094 in total compensation from the Company. This included $52,000 in fees earned or paid in cash, $203,102 in stock awards, and $199,992 in option awards. For the 2021 Fiscal Year, Defendant Jooss received $436,299 in total compensation from the Company. This included $51,500 in fees earned or paid in cash, $184,828 in stock awards, and $199,971 in option awards. For the 2020 Fiscal Year, Defendant Jooss received $331,141 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $281,141 in option awards.

47.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Jooss made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| June 3, 2022 | 1,483 | $22.82 | $33,842 |

48.     Thus, in total, before the fraud was exposed, she sold 1,483 shares of Company stock on inside information, for which she received approximately $33,842 in proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

49.     The 2023 Proxy Statement stated the following about Defendant Jooss:

***Karin Jooss, Ph.D.*** has served as a director since March 2019. She has served as Executive Vice President of Research and Chief Scientific Officer of Gritstone Bio, Inc. ("Gritstone") (formerly Gritstone Oncology, Inc.), a clinical-stage biotechnology company developing cancer and infectious disease immunotherapies, since April 2016, and as Executive Vice President and Head of R&D since March 2021. Prior to Gritstone, from May 2009 to April 2016, Dr. Jooss served as head of cancer immuno-therapeutics in the vaccine immuno-therapeutics department at Pfizer, Inc. ("Pfizer"), a public pharmaceutical company, where she was also a member of the vaccine immuno-therapeutics leadership team and served as head of the immuno-pharmacology team. Prior to joining Pfizer, Dr. Jooss served as Vice President of research at Cell Genesys, Inc. ("Cell Genesys"), from June 2005 to April 2009, and as Senior Director of Research at Cell Genesys from July 2001 to June 2005. She is on the editorial board of Molecular Therapy and the Journal of Gene Medicine and is a member of the Immunology and Educational Committee of the American Society of Gene & Cell Therapy and the Industry Task Force of the Society for Immunotherapy of Cancer. Dr. Jooss received her diploma in theoretical medicine and a Ph.D. in molecular biology and immunology from the University of Marburg in Germany, and performed postgraduate work in gene therapy and immunology at the University of Pennsylvania.

The Board of Directors believes Dr. Jooss is qualified to serve on our Board of Directors due to her extensive experience in the biotechnology industry.

**Defendant Lee**

50.  Defendant Lee has served as a Company director since July 2018. He also serves as a member of the advisory Science & Technology Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Lee beneficially owned 2,681 shares of the Company's common stock, representing less than 1% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $5.70, Defendant Lee owned approximately $15,282 worth of Fate stock.

51.  For the 2022 Fiscal Year, Defendant Lee received $449,094 in total compensation from the Company. This included $46,000 in fees earned or paid in cash, $203,102 in stock awards, and $199,992 in option awards. For the 2021 Fiscal Year, Defendant Lee received $430,549 in total compensation from the Company. This included $45,750 in fees earned or paid in cash, $184,828 in stock awards, and $199,971 in option awards. For the 2020 Fiscal Year, Defendant Lee received $326,141 in total compensation from the Company. This included $45,000 in fees earned or paid in cash and $281,141 in option awards.

52.  The 2023 Proxy Statement stated the following about Defendant Lee:

*Michael Lee* has served as a director since July 2018. Mr. Lee has served as Co-Founder and Portfolio Manager at Redmile Group, LLC ("Redmile") since 2007. Prior to Redmile, Mr. Lee worked as a biotechnology investor at Steeple Capital, and as an analyst at Welch Capital Partners and Prudential Equity Group. Mr. Lee currently serves on the board of directors of IGM Biosciences, Inc. and Shattuck Labs, Inc. Mr. Lee holds a B.S. in Molecular and Cellular Biology from the University of Arizona.

The Board of Directors has determined that Mr. Lee's extensive business and leadership experience in the biotechnology industry qualifies him to serve as a member of our Board of Directors.

**Defendant Mendlein**

53.     Defendant Mendlein has served as a Company director since April 2008 and as the Vice Chairman of the Board since November 2011. He also serves as a member of the advisory Science & Technology Committee. Prior to this, Defendant Mendlein served as founding Chairman of the Board and as the Company's Chief Science Officer. He also served as the chair of the Compensation Committee from May 2018 until February 2023. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Mendlein beneficially owned 302,581 shares of the Company's common stock, representing less than 1% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $5.70, Defendant Mendlein owned approximately $1,724,712 worth of Fate stock.

54.     For the 2022 Fiscal Year, Defendant Mendlein received $461,094 in total compensation from the Company. This included $58,000 in fees earned or paid in cash, $203,102 in stock awards, and $199,992 in option awards. For the 2021 Fiscal Year, Defendant Mendlein received $442,049 in total compensation from the Company. This included $57,250 in fees earned or paid in cash, $184,828 in stock awards, and $199,971 in option awards. For the 2020 Fiscal Year, Defendant Mendlein received $337,308 in total compensation from the Company. This included $56,167 in fees earned or paid in cash and $281,141 in option awards.

55.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mendlein made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| March 10, 2022 | 31,562 | $35.10 | $1,107,984 |
| June 3, 2022 | 1,364 | $22.79 | $31,085 |

Thus, in total, before the fraud was exposed, he sold 32,926 shares of Company stock on

19

inside information, for which he received approximately $1,139,069 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

56. The 2023 Proxy Statement stated the following about Defendant Mendlein:

**John D. Mendlein, Ph.D., J.D.** has served as our Vice Chairman of the Board of Directors since November 2011 and a director since April 2008, and previously served as the founding Chairman of our Board of Directors and as our Chief Science Officer. Dr. Mendlein has served as an Executive Partner of Flagship Pioneering, an innovation firm, since February 2019. Prior to that, Dr. Mendlein served as President, Corporate and Product Strategy, of Moderna, Inc. (formerly known as Moderna Therapeutics, Inc.) ("Moderna"), a clinical stage biopharmaceutical company, from January 2018 to February 2019. Dr. Mendlein also served as Chief Executive Officer of aTyr Pharma, Inc. from September 2011 to November 2017, and served as Executive Chairman of its board of directors from July 2010 to December 2015. He also held board positions with Axcella Health, Inc., an amino acid biologics company, The BIO (Biotechnology Industry Organization) emerging companies board, Editas Medicine, Inc., a genome editing company, and Moderna Therapeutics, Inc. Dr. Mendlein previously served from 2005 to 2008 as the Chief Executive Officer of Adnexus Therapeutics, Inc., a biopharmaceutical company, which was purchased by Bristol-Myers Squibb ("BMY") in 2008. Dr. Mendlein also served on the board of directors of Monogram Biosciences, Inc., an HIV and oncology diagnostic company that was acquired by Laboratory Corporation of America Holdings in 2009. Before that, he served as Chairman and Chief Executive Officer of Affinium Pharmaceuticals Ltd. (acquired by Debiopharm Group) from 2000 to 2005, and board member, General Counsel and Chief Knowledge Officer at Aurora Bioscience Corporation (acquired by Vertex Pharmaceuticals, Inc.) from August 1996 to September 2001. Dr. Mendlein holds a Ph.D. in physiology and biophysics from the University of California, Los Angeles, a J.D. from the University of California College of the Law, San Francisco and a B.S. in biology from the University of Miami.

The Board of Directors has determined that Dr. Mendlein's extensive business and leadership experience in the biotechnology industry qualifies him to serve as a member of our Board of Directors.

**Defendant Rastetter**

57.    Defendant Rastetter has served as the Chairman of the Board and as a Company director since November 2011. Previously, he served as interim CEO from February 2012 until October 2012. He also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Rastetter beneficially owned 608,774 shares of the Company's common stock, representing less than 1% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $5.70, Defendant Rastetter owned approximately $3,470,012 worth of Fate stock.

58.    For the 2022 Fiscal Year, Defendant Rastetter received $485,594 in total compensation from the Company. This included $82,500 in fees earned or paid in cash, $203,102 in stock awards, and $199,992 in option awards. For the 2021 Fiscal Year, Defendant Rastetter received $466,049 in total compensation from the Company. This included $81,250 in fees earned or paid in cash, $184,828 in stock awards, and $199,971 in option awards. For the 2020 Fiscal Year, Defendant Rastetter received $360,974 in total compensation from the Company. This included $79,833 in fees earned or paid in cash and $281,141 in option awards.

59.    The 2023 Proxy Statement stated the following about Defendant Rastetter:

**William H. Rastetter, Ph.D.** has served as Chairman of the Board and a director since November 2011. From February 2012 to October 2012, he also served as our interim Chief Executive Officer. He is a Co-Founder of Receptos, Inc., a biopharmaceutical company that is a wholly-owned subsidiary of Celgene, where he served as a director and Chairman of the Board from 2009 to 2015, and was Acting Chief Executive Officer from May 2009 to November 2010. Dr. Rastetter also served as the Chairman of Illumina, Inc. ("Illumina") from 2005 to 2016, as a director of Illumina from 1998 to 2016. He was a founding director, interim Chief Executive Officer, and Chairman of Grail, Inc. which was acquired by Illumina in 2021. Dr. Rastetter currently serves as the Chairman of Neurocrine Biosciences, Inc., as a director of Regulus Therapeutics, Inc., and as Chairman of Daré

Bioscience, Inc., previously known as Cerulean Pharma, Inc. He is also an independent board member of Entos, Inc., a privately held company. He also serves as an advisor to Illumina Ventures, a genomics focused venture firm. Dr. Rastetter served as a Partner at the venture capital firm Venrock from 2006 to February 2013. Prior to that, Dr. Rastetter was Executive Chairman of Biogen Idec, from the merger of the two companies (Biogen and Idec Pharmaceuticals) in 2003 through the end of 2005. He joined Idec Pharmaceuticals at its founding in 1986 and served as Chairman and Chief Executive Officer. At Idec Pharmaceuticals he was a co-inventor of rituximab, the first monoclonal antibody approved by the FDA for cancer therapy. Prior to Idec Pharmaceuticals, he was director of Corporate Ventures at Genentech, Inc. ("Genentech") and also served in a scientific capacity at Genentech. Dr. Rastetter held various faculty positions at the Massachusetts Institute of Technology and Harvard University and was an Alfred P. Sloan Fellow. Dr. Rastetter holds a Ph.D. and M.A. in chemistry from Harvard University and an S.B. in chemistry from the Massachusetts Institute of Technology.

The Board of Directors believes Dr. Rastetter is qualified to serve on our Board of Directors due to his extensive experience in the biotechnology industry, his broad leadership experience with Idec Pharmaceuticals and on several boards of biotechnology companies, and his experience with financial matters.

**Defendant Xu**

60.   Defendant Xu has served as a Company director since August 2021. She also serves as a member of the Compensation Committee and previously served as a member of the Nominating and Corporate Governance Committee from February 2022 to February 2023. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Xu beneficially owned 1,581 shares of the Company's common stock, representing less than 1% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $5.70, Defendant Xu owned approximately $9,012 worth of Fate stock.

61.   For the 2022 Fiscal Year, Defendant Xu received $452,627 in total compensation from the Company. This included $49,533 in fees earned or paid in cash,

Verified Shareholder Derivative Complaint

$203,102 in stock awards, and $199,992 in option awards. For the 2021 Fiscal Year, Defendant Xu received $811,840 in total compensation from the Company. This included $16,667 in fees earned or paid in cash, $394,938 in stock awards, and $400,235 in option awards.

62.    The 2023 Proxy Statement stated the following about Defendant Xu:

*Yuan Xu, Ph.D.* has served as a director since August 2021. She has served as an independent director on the board of Akero Therapeutics since April 2021, and a member of the board of directors of Xilio Therapeutics, a biotechnology company, since January 2022. Previously, she served as a board member and Chief Executive Officer for Legend Biotech Co. from March 2018 to August 2020, playing a leading role in its initial public offering. Dr. Xu's prior career as a senior executive includes Senior Vice President leading Merck's Biologics & Vaccines subdivision from August 2015 to August 2017, as well as leading biopharmaceutical development and manufacturing groups for Gilead, Novartis and GlaxoSmithKline. In her early career, Dr. Xu held various scientific, regulatory and operations roles at Amgen, Chiron and Genentech. Dr. Xu received a B.S. in biochemistry from Nanjing University and a Ph.D. in biochemistry from the University of Maryland, and she completed her postdoctoral training in virology and gene therapy at the University of California, San Diego.

The Board of Directors believes Dr. Xu is qualified to serve on our Board of Directors due to her long-standing track record of executive and scientific leadership in biopharmaceutical research, development, manufacturing, commercialization and life-cycle management.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

63.    By reason of their positions as officers, directors, and/or fiduciaries of Fate and because of their ability to control the business and corporate affairs of Fate, the Individual Defendants owed Fate and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care and were and are required to use their utmost ability to control and manage Fate in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fate and its shareholders so as to benefit all shareholders equally.

64.     Each director and officer of the Company owes to Fate and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65.     The Individual Defendants, because of their positions of control and authority as directors, and/or officers of Fate, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

66.     To discharge their duties, the officers and directors of Fate were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

67.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Fate, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Fate's Board at all relevant times.

68.     As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements,

business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

69. To discharge their duties, the officers and directors of Fate were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Fate were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States and pursuant to Fate's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Fate conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Fate and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal

legal, financial, and management controls, such that Fate's operations would comply with all applicable laws and Fate's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.     Each of the Individual Defendants further owed to Fate and the shareholders the duty of loyalty requiring that each favor Fate's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

71.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Fate and were at all times acting within the course and scope of such agency.

72.     Because of their advisory, executive, managerial, directorial, and controlling positions with Fate, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

73.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Fate.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

74.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

75.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

76.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Fate was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

77.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the

Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

78.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fate and was at all times acting within the course and scope of such agency.

## FATE'S CODE OF CONDUCT

79.     Pursuant to Fate's Code of Conduct, all of the Company's officers, directors, and employees' conduct is governed by the Code of Conduct.

80.     The Code of Conduct provides, under the section titled "Purpose and Scope," that:

> The Company expects its directors, officers and employees to exercise reasonable judgment when conducting the Company's business. The Company encourages its directors, officers and employees to refer to this Code frequently to ensure that they are acting within both the letter and the spirit of this Code. The Company also understands that this Code will not contain the answer to every situation you may encounter or every concern you may have about conducting the Company's business ethically and legally. In these situations, or if you otherwise have questions or concerns about this Code, the Company encourages each officer and employee to speak with his or her supervisor (if applicable) or, if you are uncomfortable doing that, with the Compliance Officer under this Code.

81.     The Code of Conduct notes that Fate's "directors, officers and employees generally have other legal and contractual obligations to the Company" and that "the standards in this Code should be viewed as the *minimum standards* that the Company expects from its directors, officers and employees in the conduct of the Company's business." (Emphasis in original.)

82.     The Code of Conduct provides, as to "Compliance with Laws, Rules and Regulations," that:

Verified Shareholder Derivative Complaint

The Company seeks to conduct its business in compliance with applicable laws, rules and regulations. No director, officer or employee shall engage in any unlawful activity in conducting the Company's business or in performing his or her day-to-day company duties, nor shall any director, officer or employee instruct others to do so.

83.     The Code of Conduct provides, as to "Corporate Opportunities" that "[e]mployees, officers, and directors owe a duty to the Company to advance its legitimate business interests when the opportunity to do so arises" and that "[e]ach employee, officer, and director is prohibited from [] using the Company's property or information or his or her position for improper personal gain[.]"

84.     The Code of Conduct provides the following in its "Fair Dealing" section:

Competing vigorously, yet lawfully, with competitors and establishing advantageous, but fair, business relationships with customers and suppliers is a part of the foundation for long-term success. Unlawful and unethical conduct, which may lead to short-term gains, may damage a company's reputation and long-term business prospects, as well as subject the Company and relevant individuals to criminal and civil liability. Accordingly, it is the Company's policy that directors, officers and employees must endeavor to deal ethically and lawfully with the Company's collaborators, customers, suppliers, competitors and employees in all business dealings on the Company's behalf. No director, officer or employee should take unfair advantage of another person in business dealings on the Company's behalf through the abuse of privileged or confidential information or through improper manipulation, concealment or misrepresentation of material facts.

85.     The Code of Conduct provides in its "Accuracy of Records" section, the following in relevant part:

The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements is fundamental to the Company's continued and future business success. Company business records should always be prepared accurately and reliably. No director, officer or employee may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner.

86.     The Code of Conduct provides in its "Quality of Public Disclosures" section, the following:

The Company is committed to providing its stockholders with complete and accurate information about its financial condition and results of operations as required by the securities laws of the United States. It is the Company's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Company, include fair, timely and understandable disclosure. Officers and employees who are responsible for these filings and disclosures, including the Company's principal executive, financial and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and objectively in order to ensure that this disclosure policy is fulfilled. The Company's senior management are primarily responsible for monitoring the Company's public disclosure.

87.    Under "Compliance Procedures" in a subsection titled "Communication of Code," the Code of Conduct maintains that all directors and officers are aware of the Code of Conduct, stating the following in relevant part:

All directors, officers and employees will be supplied with a copy of the Code upon its enactment (or the enactment of any amendment thereto) or upon beginning service at the Company, and thereafter, may be asked to review and sign an acknowledgment regarding the Code on a periodic basis. Updates of the Code will be provided from time to time. A copy of the Code is also available to all directors, officers and employees by requesting one from the human resources department or the Compliance Officer or by accessing the Company's website at www.fatetherapeutics.com.

88.    In a subsection titled "Monitoring Compliance and Disciplinary Action," the Code of Conduct provides that the Board, including the Audit Committee, shall ensure compliance with the Code of Conduct, in relevant part:

The Company's management, under the supervision of its Board of Directors or a committee thereof or, in the case of accounting, internal accounting controls, auditing or securities law matters, the Audit Committee, shall take reasonable steps from time to time to (i) monitor compliance with the Code, including the establishment of monitoring and auditing systems that are reasonably designed to investigate and detect conduct in violation of the Code and (ii) when appropriate, impose and enforce appropriate disciplinary measures for violations of the Code.

89.   In a subsection titled "Waivers and Amendments," the Code of Conduct provides the following, in relevant part:

> No waiver of any provisions of the Code for the benefit of a director or an executive officer (which includes, without limitation, for purposes of this Code, the Company's principal executive, financial and accounting officers) shall be effective unless (i) approved by the Board or, if permitted, a committee thereof , and (ii) if applicable, such waiver is promptly disclosed to the Company's stockholders in accordance with applicable U.S. securities laws and/or the rules and regulations of the exchange or system on which the Company's shares are traded or quoted, as the case may be.

**Audit Committee Charter**

90.   Fate's Audit Committee Charter states that the Audit Committee's purpose is to: (i) oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements; (ii) take, or recommend that the Board take, appropriate action to oversee the qualifications, independence and performance of the Company's independent auditors; (iii) prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's proxy statement for its annual meeting of stockholders; and (iv) review, assess and consider, in consultation with management and the Board, as appropriate, the overall risk management policies and procedures of the Company.

91.   In a subsection titled "Audited Financial Statements and Annual Audit," the Audit Committee is charged with the following responsibilities:

> • The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the independent auditors the Company's annual audited financial statements, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

31

- The Audit Committee shall review:

  (i) any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the independent auditors. The Audit Committee may also consider other material written communications between the registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

  (ii) major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

  (iii) major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

  (iv) the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

92.    In a subsection titled "Unaudited Quarterly Statements," the Audit Committee is charged with the following responsibility:

The Audit Committee shall discuss with management and the independent auditors, prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Audit Committee's attention by the independent auditors pursuant to Statement on Auditing Standards No. 100, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

Verified Shareholder Derivative Complaint

93.     In a subsection titled "Quarterly Earnings Press Releases," the Audit Committee is charged with the following responsibility:

> The Audit Committee shall discuss the Company's quarterly earnings press releases, as well as any new financial information and earnings or other guidance to be provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

94.     In a subsection titled "Risk Assessment and Management," the Audit Committee is charged with the following responsibilities:

> • The Audit Committee shall evaluate and determine, or upon the request of the Board, recommend for determination by the Board, the achievement of milestones under any contractual arrangement with any third party pursuant to which any contingent right or obligation of the Company may be triggered; provided, that the foregoing shall not apply to the determination of achievement of any performance milestones for the purpose of equity award vesting or acceleration under any compensatory agreement with an employee, consultant or other individual service provider, which determinations shall remain within the scope of the authority of the Compensation Committee and the Board.

> • The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

> • In connection with the Audit Committee's discussion of the Company's financial, accounting and financial statement risk assessment and management guidelines, the Audit Committee may discuss or consider the Company's major financial risk exposures and the steps that the Company's management has taken to monitor and control such exposures.

> • The Audit Committee shall periodically review and discuss with management and the Board items of enterprise risk beyond financial risk and management of financial statements. The Audit Committee may recommend on at least an annual basis, and more frequently as appropriate, enterprise risk items that should be brought to the Board for review and discussion of risk mitigation.

Verified Shareholder Derivative Complaint

95.     In a subsection titled "Legal and Regulatory Compliance," the Audit Committee is charged with the following responsibilities:

- The Audit Committee may discuss with management and the independent auditors, and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements. After these discussions, the Audit Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

- The Audit Committee may discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

- The Audit Committee shall exercise general oversight over management in connection with legal and regulatory requirements, both U.S. (federal and state) and foreign, applicable to the Company, and shall periodically evaluate the Company's policies and procedures to ensure the Company's compliance with changing regulatory requirements and foreign policy, including the adoption of domestic or foreign laws, regulations and interpretations that may affect the Company's business.

96.     In violation of the Code of Conduct and the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, at least seven of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**

97.    Fate is a Delaware corporation based in San Diego, California that focuses on bringing programmed cellular immunotherapies to patients with cancer and autoimmune disorders.

98.    On April 2, 2020, after market hours, Fate issued a press release that announced the Collaboration Agreement with Janssen. The Collaboration Agreement provided Fate with a $50 million upfront payment for cell-based cancer immunotherapies, along with eligibility to receive up to $3 billion in milestone payments and double-digit royalties on any net sales from the collaboration.

## FALSE AND MISLEADING STATEMENTS

### *April 2, 2020 Press Release*

99.    The Relevant Period began on April 2, 2020 when Fate issued a press release that announced it had entered into the Collaboration Agreement with Janssen. The press release stated the following, in relevant part:

> Fate [. . .] announced today a global collaboration and option agreement with Janssen Biotech, Inc. (Janssen), one of the Janssen Pharmaceutical Companies of Johnson & Johnson.

> Under the multi-year collaboration agreement, Janssen will contribute proprietary antigen binding domains for up to four tumor-associated antigen targets. The Company will apply its iPSC product platform to research and preclinically develop new iPSC-derived chimeric antigen receptor (CAR) NK and CAR T-cell product candidates. The Company will receive $50 million in cash and $50 million from the purchase by Johnson & Johnson Innovation – JJDC, Inc. of newly issued shares of the Company's common stock at a price per share of $31.00. Janssen will also reimburse the Company for all activities conducted under the collaboration.

> "We are delighted to enter this strategic collaboration, which brings together Janssen's scientific and global commercialization leadership, deep domain expertise in oncology and proprietary technologies for targeting and binding

certain tumors and our industry-leading iPSC product platform to develop novel off-the-shelf CAR NK and T-cell cancer immunotherapies," said Scott Wolchko, President and Chief Executive Officer of Fate Therapeutics. "The collaboration strengthens our financial and operating position through a focused effort of developing cell-based cancer immunotherapies utilizing Janssen's proprietary antigen binding domains, while enabling us to continue to exploit our deep pipeline of wholly-owned product candidates and further develop our off-the-shelf, iPSC-derived cell-based immunotherapies."

The Company will advance candidates under the collaboration to the filing of an Investigational New Drug (IND) application, after which Janssen will have the right to exercise its option for an exclusive license for the development and commercialization of collaboration candidates targeting the tumor-associated antigens. The Company will be primarily responsible for the manufacture of collaboration candidates, the cost of which will be paid for by Janssen. The Company is eligible to receive payments of up to $1.8 billion upon the achievement of development and regulatory milestones and up to $1.2 billion upon the achievement of commercial milestones, plus double-digit royalties on worldwide commercial sales of products targeting the antigens. In addition, the Company has the right to elect to co-commercialize each collaboration candidate in the U.S. and share equally in profits and losses in the U.S., subject to its payment of certain clinical development costs and adjustments in milestone and royalty payments.

100.   On this news, the Company's stock price surged 8.8% in trading on April 3, 2020.

**May 11, 2020 Press Release**

101.   On May 11, 2020, Fate issued a press release that announced its financial results for the first quarter of 2020, among other things. The press release stated the following, in relevant part:

"[W]e entered into a transformative collaboration with Janssen that leverages our iPSC product platform and Janssen's proprietary tumor-targeting antigen binders to develop novel CAR NK and CAR T-Cell product candidates for hematologic malignancies and solid tumors, supporting our fundamental goal of bringing off-the-shelf, iPSC-derived cell-based cancer immunotherapies to patients."

102.   In a section titled "Corporate Highlights," the press release stated the following:

**Corporate Highlights**

• **Strategic Collaboration Formed with Janssen for Novel iPSC-derived Cell-based Cancer Immunotherapies**. In April, the Company entered into a global collaboration and option agreement with Janssen Biotech, Inc. (Janssen), one of the Janssen Pharmaceutical Companies of Johnson & Johnson, to develop iPSC-derived chimeric antigen receptor (CAR) NK and CAR T-cell product candidates targeting up to four tumor-associated antigens for which Janssen is contributing proprietary antigen binding domains. The Company is eligible to receive payments of up to $3.0 billion upon the achievement of certain development, regulatory and commercial milestones, plus tiered double-digit royalties on worldwide net sales of products targeting the antigens. In addition, the Company has the right to elect to co-commercialize each product candidate in the U.S. and share equally in profits and losses in the U.S., subject to its payment of certain clinical development costs and adjustments in milestone and royalty payments. The Company received $100 million upon entering into the collaboration, including $50 million in an upfront cash payment and $50 million from the purchase by Johnson & Johnson Innovation – JJDC, Inc. of newly issued shares of the Company's common stock at a price per share of $31.00.

*May 11, 2020 Conference Call*

103.   Also on May 11, 2020, Fate held a conference call with analysts and investors to discuss the Company's financial results for the first quarter of 2020. During the call, Defendant Wolchko stated the following, in relevant part:

Finally, I'd like to make a few comments about our newly formed collaboration with Janssen. The partnership is transformative for us. And I believe it significantly increases our ability to invest in innovation, build commercial-scale iPSC manufacturing operations, bring best-in-class iPS-derived cell-based cancer immunotherapies to patients and deliver value to shareholders. The collaboration brings together Janssen's scientific leadership in deep domain expertise in oncology and our industry-leading

iPSC product platform. Our mutual objective is to research, develop and commercialize novel off-the-shelf iPS-derived CAR NK and CAR-T cell products.

104.   Regarding the funding and development under the Collaboration Agreement, Defendant Wolchko stated the following:

Importantly, all these activities are entirely funded by Janssen. And we will receive full funding for all innovation, preclinical development and the IND-enabling activities that we perform under the collaboration. Upon the completion of activities sufficient to allow for submission of an IND, Janssen will have the right to exercise an exclusive option. And obtain an exclusive license, for the clinical development and commercialization of the collaboration candidate.

Janssen will be solely responsible for worldwide clinical development and commercialization. And we will be primarily responsible for the manufacture, at Janssen's cost, of the collaboration candidate.

105.   Regarding the economics of the Collaboration Agreement and the payments Fate was eligible to receive under it, Defendant Wolchko stated the following:

With respect to the collaboration economics, we received $100 million in April of which $50 million was an upfront cash payment and $50 million was in the form of an equity investment at $31 per share.
***
In total, assuming only one collaboration candidate, across each of the four antigen targets we are eligible to receive payments of up to $1.8 billion, upon the achievement of development and regulatory milestones and up to $1.2 billion, upon the achievement of commercial milestones.

106.   Regarding the Collaboration Agreement's strategic value, Defendant Wolchko stated the following:

With respect to the collaboration's strategic value, I would highlight several key points. First, we have partnered with one of the strongest oncology teams in the entire industry, one, with outstanding scientific clinical development and commercialization expertise.

We will be building collaboration candidates using proprietary binding domains, identified and optimized by Janssen, creating the opportunity to develop highly differentiated products.

Second, Janssen has committed substantial dollars to the collaboration's work plan. And we will be receiving significant annual research and development payments to drive innovation, including for the research and development of next-generation features and functionality, and for the scaling of our GMP manufacturing processes to support commercial-scale operations.

Importantly, we retained rights to this innovation for use across our iPSC product platform. Furthermore, the collaboration represents an opportunity for us to leverage our industry-leading iPSC product platform. And expand our product pipeline. We have not encumbered our existing product pipeline, in any way whatsoever.

For each collaboration candidate, we retained significant economic interest, with the rights to opt in to co-commercialization and equal share of profits and losses in the U.S. Lastly, I would highlight that we retained responsibility for the manufacture of collaboration products.

Under the collaboration we have formed a joint manufacturing committee, where Janssen can provide advice and support for our activities, in building and scaling a world-class cell therapy manufacturing operation.

### August 5, 2020 Press Release

107. On August 5, 2020, Fate issued a press release that announced the Company's financial results for the second quarter of 2020, among other things. The press release stated, in relevant part, "we successfully launched our Janssen collaboration with strong momentum, bringing together Janssen's proprietary tumor-targeting antigen binders and our industry-leading iPSC product platform to develop novel off-the-shelf CAR NK and CAR T-cell immunotherapies for hematologic malignancies and solid tumors."

### August 5, 2020 Conference Call

Verified Shareholder Derivative Complaint

108.    Also on August 5, 2020, Fate held a conference call with analysts and investors to discuss the Company's financial results for the second quarter of 2020. During the call, Defendant Wolchko stated the following, in relevant part:

> And we're informing and launching a transformative partnership with Janssen, bringing together our industry-leading iPSC product platform with Janssen's proprietary tumor targeting antigen binders to develop novel off-the-shelf CAR NK and CAR T-cell immunotherapies for both hematologic malignancies and solid tumors.
>
> ***
>
> We are also leveraging our unique ability to build multiplexed engineered cell products of increasing complexity, using already established clonal master engineered iPSC lines with our collaboration partners, including under our newly formed collaboration with Janssen, which brings together Janssen's deep domain expertise in oncology and our industry-leading iPSC cell product platform.
>
> We have successfully launched this collaboration with strong momentum. Janssen has already contributed proprietary antigen-binding domains against one hematologic malignancy target and one solid tumor target, for which we are building novel CAR constructs. As a first step, we are incorporating these constructs into existing multiplex engineered master iPSC cell lines, which may enable an efficient and accelerated pathway to clinical development for the collaboration's initial product candidates.

109.    Regarding the Company's second quarter 2020 financial results in particular, Defendant Wolchko stated the following:

> Turning to our financial results. Revenue was $5.5 million for the second quarter of 2020 compared to $2.8 million for the same period last year. Revenue in the current quarter was derived from our collaboration with Janssen and ONO Pharmaceutical.

*November 5, 2020 Press Release*

110.   On November 5, 2020, Fate issued a press release that announced the Company's financial results for the third quarter of 2020. The press release stated, in relevant part, that "[r]evenue was $7.6 million for the third quarter of 2020, which was derived from the Company's collaborations with Janssen and Ono Pharmaceutical."

*February 24, 2021 10-K*

111.   On February 24, 2021, the Company filed its annual report on Form 10-K with the SEC for the 2020 Fiscal Year (the "2020 10-K"). The 2020 10-K was signed by Defendants Wolchko, Dulac, Rastetter, Mendlein, Agarwal, Coughlin, Epstein, Hershberg, Jooss, and Lee, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Wolchko and Dulac attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

112.   Regarding Fate's strategy, the 2020 10-K stated the following, in relevant part:

> **Selectively share our iPSC product platform with industry-leading strategic partners for the development of iPSC-derived cell therapies.** The research, development and clinical investigation of cell therapies for the treatment of human diseases is rapidly expanding. We believe we are uniquely positioned as an expert partner of choice for industry-leading developers seeking to develop iPSC-derived cell therapies for the treatment of human diseases, including cancer. For example, we are collaborating with Ono Pharmaceutical Co. Ltd. (Ono) to develop and commercialize off-the-shelf, iPSC-derived CAR T-cells for the treatment of certain solid tumors, ***and we are collaborating with Janssen Biotech, Inc. (Janssen), part of the Janssen Pharmaceutical Companies of Johnson & Johnson, to develop and commercialize off-the-shelf, iPSC-derived CAR NK cell and CAR T-cell product candidates for the treatment of certain hematologic malignancies and solid tumors.*** Since iPSCs have the unique capacity to be

genetically engineered, indefinitely expanded and differentiated in culture into any type of cell in the body, we believe there is significant opportunity to broadly exploit our industry-leading iPSC product platform and intellectual property position in other disease areas beyond cancer. We will continue to seek partnerships with institutions and companies for the research, development and commercialization of iPSC-derived cell therapies for the treatment of human diseases.

(Emphasis added.)

### February 24, 2021 Press Release

113.   Also on February 24, 2021, Fate issued a press release that announced the Company's fourth quarter and 2020 Fiscal Year financial results, among other things. The press release stated the following, in relevant part:

"2020 was a pivotal year for Fate Therapeutics. We demonstrated the clinical safety and therapeutic activity of engineered iPSC-derived NK cell therapy as patients with relapsed / refractory lymphoma achieved objective responses across our FT516 and FT596 Phase 1 studies. We successfully worked with the FDA to enable clinical investigation of FT538, the first-ever CRISPR-edited, iPSC-derived cell therapy, and FT576, the first-ever cell therapy engineered with four functional anti-tumor modalities, in patients with multiple myeloma. *We also made strong progress with our strategic partners, Ono Pharmaceutical and Janssen, in leveraging the unique advantages of our iPSC product platform to advance multiplexed-engineered CAR NK and CAR T-cell product candidates toward clinical development for solid tumors,"* said Scott Wolchko, President and Chief Executive Officer of Fate Therapeutics. "We look forward to a promising 2021 where we expect to have clinical read-outs across our programs, treat patients with the first-ever iPSC-derived CAR T-cell therapy, submit IND applications for two iPSC-derived CAR NK cell programs targeting novel antigens in solid tumors, and open our second cGMP manufacturing facility for an additional 40,000 square feet of capacity."

***

**Total Revenue**: Revenue was $15.9 million for the fourth quarter of 2020, which was derived from the Company's collaborations with Janssen and Ono Pharmaceutical.

(Emphasis added.)

### February 24, 2021 Conference Call

114.   On the same day, Fate held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter of 2020. During the call, Defendant Wolchko stated the following, in relevant part:

> We also continued to innovate and optimize our manufacturing process, including under our collaborations with ONO and Janssen and we have initiated a second GMP manufacturing run of FT819 to implement certain improvements. We expect to treat the first patients with FT819 in the middle of 2021.
>
> ***
>
> And finally, we believe our iPSC product platform represents the ideal framework for designing and developing multiplex engineered CAR NK cell product candidates. And we currently have four novel IPS derived CAR NK cell programs for solid tumors undergoing preclinical development. These programs include three wholly-owned programs and one program under our collaboration with Janssen.

### The 2021 Proxy Statement

115.   On April 21, 2021, Fate filed its Schedule 14A with the SEC (the "2021 Proxy Statement"). Defendants Wolchko, Rastetter, Mendlein, Coughlin, Epstein, Hershberg, Lee, Jooss, and Agarwal solicited the 2021 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

116.   With respect to the Risk Oversight, the 2021 Proxy Statement stated the following:

> Risk is inherent with every business, and how well a business manages risk can ultimately determine its success. We face a number of risks, including risks relating to our financial condition, development and commercialization activities, operations and intellectual property. Management is responsible for the day-to-day management of risks we face, while our Board of

43

Directors, as a whole and through its committees, has responsibility for the oversight of risk management. In its risk oversight role, our Board of Directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed.

The role of our Board of Directors in overseeing the management of our risks is conducted primarily through committees of the Board of Directors, as disclosed in the descriptions of each of the committees below and in the charters of each of the committees. The full Board of Directors (or the appropriate board committee in the case of risks that are under the purview of a particular committee) discusses with management our major risk exposures, their potential impact on our company, and the steps we take to manage them. When a board committee is responsible for evaluating and overseeing the management of a particular risk or risks, the chairman of the relevant committee reports on the discussion to the full Board of Directors during the committee reports portion of the next board meeting. This enables our Board of Directors and its committees to coordinate the risk oversight role, particularly with respect to risk interrelationships.

117.   The 2021 Proxy Statement also called for shareholder approval of: (1) the election of directors Hershberg, Rastetter, and Lee; (2) the ratification of the appointment of Ernst & Young LLP as the independent registered public accounting firm of the Company for the 2021 Fiscal Year; (3) the named executive officers' compensation via non-binding advisory vote; and (4) the amendment of the Amended and Restated Certificate of Incorporation to increase the authorized number of shares of common stock from 150,000,000 to 250,000,000.

118.   The 2021 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

119.   The 2021 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Collaboration Agreement was far less viable than Fate had represented to investors and

the public; (2) consequently, several of the clinical programs, milestone payments, and royalty payments pertaining to the Collaboration Agreement could not be expected to provide future revenue sources for Fate; (3) as a result, Fate exaggerated the Collaboration Agreement's overall long-term medical and economic benefits; and (4) due to the aforementioned conduct, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

120.   As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

121.   As a result of Defendants Wolchko, Rastetter,  Mendlein, Coughlin, Epstein, Hershberg, Lee, Jooss, and Agarwal causing the 2021 Proxy Statement to be false and misleading, Company shareholders, *inter alia*: (1) elected and reelected Board members who were violating their fiduciary duties, thereby enabling the Individual Defendants to perpetuate their misconduct and (2) voted to increase the number of shares available in the Company's Certificate of Incorporation from 150,000,000 to 250,000,000 shares.

### *May 5, 2021 Press Release*

122.   On May 5, 2021, Fate issued a press release that announced the Company's financial results for the first quarter of 2021, among other things. The press release stated, in relevant part, that "[r]evenue was $11.1 million for the first quarter of 2021, which was derived from the Company's collaborations with Janssen and Ono Pharmaceutical."

### *August 4, 2021 Press Release*

123.   On August 4, 2021, Fate issued a press release that announced the Company's financial results for the second quarter of 2021, among other things. The press release stated the following, in relevant part:

**Preclinical Milestone Reached for First Product Candidate under Janssen Collaboration.** In June, the Company and Janssen elected to initiate IND-enabling activities for an iPSC-derived CAR NK cell product candidate incorporating a Janssen proprietary antigen binding domain that

45

targets an antigen expressed on certain solid tumors, triggering the payment of a milestone fee to the Company from Janssen under the collaboration. Janssen maintains an option to develop and commercialize the iPSC-derived CAR NK cell product candidate in all territories of the world, with the Company retaining the option to co-commercialize the product candidate in the United States.

\*\*\*

**Total Revenue**: Revenue was $13.4 million for the second quarter of 2021, which was derived from the Company's collaborations with Janssen and Ono Pharmaceutical.

### *November 4, 2021 Conference Call*

124.   On November 4, 2021, Fate held a conference call with analysts and investors to discuss the Company's financial results for the third quarter of 2021. During the call, Defendant Dulac stated, in relevant part, that "revenue was $14.2 million for the third quarter of 2021 compared to $7.6 million for the same period last year. Revenue in the current quarter was derived from our collaborations with Janssen and Ono Pharmaceutical."

125.   Also during the call, Defendant Wolchko stated the following, in relevant part, in response to a question regarding the progress of the Janssen collaboration:

[T]he Janssen collaboration has continued to go very well. And obviously, as you can tell from the revenue that continues to increase, we continue to increase the resources under the collaboration. I think we've disclosed in the past that the collaboration started with two antigen targets, one in hematologic malignancies, one in solid tumors.

A third antigen target has now been added to the collaboration. And Janssen reserves the right to add a fourth target to the collaboration. So, collaboration is moving forward. We're really pleased with it. I think we'll be able to give a little bit of visibility on the first product candidate at the solid tumor day, although we may not be able to disclose the target quite yet.

Verified Shareholder Derivative Complaint

*February 28, 2022 Form 10-K*

126.  On February 28, 2022, Fate filed its annual report on Form 10-K with the SEC for the 2021 Fiscal Year (the "2021 10-K"). The 2021 10-K was signed by Defendants Wolchko, Dulac, Rastetter, Mendlein, Agarwal, Coughlin, Epstein, Hershberg, Jooss, Lee, and Xu and contained SOX certifications signed by Defendants Wolchko and Dulac attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

127.  The 2021 10-K contained a substantively similar depiction of the Collaboration Agreement as stated in the 2020 10-K as referenced in ¶ 112.

*February 28, 2022 Press Release*

128.  Also on February 28, 2022, Fate issued a press release that announced the Company's fourth quarter of 2021 and 2021 Fiscal Year financial results, among other things. The press release stated the following, in relevant part:

> **Preclinical Milestone Reached for Second Product Candidate under Janssen Collaboration**. In January 2022, Janssen elected to initiate IND-enabling activities for a second iPSC-derived CAR NK cell product candidate incorporating a Janssen proprietary antigen binding domain, triggering the payment of a milestone fee to the Company under the collaboration.
>
> ***
>
> **Total Revenue**: Revenue was $17.1 million for the fourth quarter of 2021, which was derived from the Company's collaborations with Janssen and Ono Pharmaceutical.

*The 2022 Proxy Statement*

129.  On April 25, 2022, Fate filed its Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Wolchko, Rastetter, Mendlein, Coughlin, Epstein, Hershberg, Lee, Jooss, Agarwal, and Xu solicited the 2022 Proxy Statement, filed

pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

130.   With respect to the Risk Oversight, the 2022 Proxy Statement stated the following:

> Risk is inherent with every business, and how well a business manages risk can ultimately determine its success. We face a number of risks, including risks relating to our financial condition, development and commercialization activities, operations and intellectual property. Management is responsible for the day-to-day management of risks we face, while our Board of Directors, as a whole and through its committees, has responsibility for the oversight of risk management. In its risk oversight role, our Board of Directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed.

> The role of our Board of Directors in overseeing the management of our risks is conducted primarily through committees of the Board of Directors, as disclosed in the descriptions of each of the committees below and in the charters of each of the committees. The full Board of Directors (or the appropriate board committee in the case of risks that are under the purview of a particular committee) discusses with management our major risk exposures, their potential impact on our company, and the steps we take to manage them. When a board committee is responsible for evaluating and overseeing the management of a particular risk or risks, the chairman of the relevant committee reports on the discussion to the full Board of Directors during the committee reports portion of the next board meeting. This enables our Board of Directors and its committees to coordinate the risk oversight role, particularly with respect to risk interrelationships.

131.   The 2022 Proxy Statement also called for shareholder approval of: (1) the election of directors Wolchko, Coughlin, and Agarwal; (2) the ratification of the appointment of Ernst & Young LLP as the independent registered public accounting firm of the Company for the 2022 Fiscal Year; (3) the named executive officers' compensation via non-binding advisory vote; and (4) the Fate Therapeutics, Inc. 2022 Stock Option and Incentive Plan (the "Plan"), which, among other things, would provide

48

for an additional 9,500,000 shares in connection with eligible awards to be received by the Company's directors and officers. The purpose of the Plan was "to enhance the flexibility to grant equity awards to [Fate's] officers, employees, non-employee directors and consultants and to ensure that [Fate] can continue to grant equity awards to eligible recipients at levels determined to be appropriate by our Board of Directors and/or the Compensation Committee."

132.    Pursuant to the Plan, awards may be granted until the tenth anniversary of the Plan's effective date, which is June 9, 2032. The Plan states that "[t]he value of all awards awarded under the [] Plan and all other cash compensation paid by" Fate "to any non-employee director in any calendar year may not exceed $1,000,000; provided, however, that such amount shall be $1,500,000 for the calendar year in which the applicable non-employee director is initially elected or appointed to the Board." The Plan is administered by the Compensation Committee.

133.    The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the numerous false and misleading statements alleged herein and the Individual Defendants' failures to report violations of the Code of Conduct.

134.    The 2022 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Collaboration Agreement was far less viable than Fate had represented to investors and the public; (2) consequently, several of the clinical programs, milestone payments, and royalty payments pertaining to the Collaboration Agreement could not be expected to provide future revenue sources for Fate; (3) as a result, Fate exaggerated the Collaboration Agreement's overall long-term medical and economic benefits; and (4) due to the aforementioned conduct, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

Verified Shareholder Derivative Complaint

135.   As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

136.   The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the Plan who would not have approved the Plan had they been informed about the Defendants' misconduct as discussed herein.

137.   As a result of Defendants Wolchko, Rastetter,  Mendlein, Coughlin, Epstein, Hershberg, Lee, Jooss, Agarwal, and Xu causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect Defendants Wolchko, Coughlin, and Agarwal to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) approve the Plan, thus allowing the Individual Defendants to materially benefit from the false and misleading statements contained in the 2022 Proxy Statement.

### *May 4, 2022 Press Release*

138.   On May 4, 2022, Fate issued a press release that announced the Company's financial results for the first quarter of 2022, among other things. The press release stated the following, in relevant part:

> "We are also poised to treat the first solid tumor patient with FT536, our multi-antigen targeted CAR MICA/B NK cell product candidate, and have initiated IND-enabling activities for two CAR NK cell product candidates under our collaboration with Janssen. We look forward to providing clinical updates for our multiplexed-engineered, iPSC-derived NK and T-cell product candidates across our disease franchises in the second half of 2022."
>
> ***
>
> **Preclinical Milestone Reached for Third Product Candidate under Janssen Collaboration**. In April 2022, Janssen nominated a third iPSC-derived, CAR-targeted cell product candidate incorporating a Janssen proprietary antigen binding domain, triggering the payment of a milestone fee to the Company under the collaboration.
>
> ***

**Total Revenue**: Revenue was $18.4 million for the first quarter of 2022, which was derived from the Company's collaborations with Janssen and Ono Pharmaceutical.

*May 4, 2022 Conference Call*

139.   Also on May 4, 2022, Fate held a conference call with analysts and investors to discuss the Company's financial results for the first quarter of 2022. During the call, Defendant Wolchko stated the following, in relevant part:

> Turning to our collaborations with Janssen and Ono. We continue to show strong momentum in bringing multiplexed-engineered iPS-derived CAR NK and CAR T cell product candidates to patients for the treatment of hematologic malignancies and solid tumors. Under our collaboration with Janssen, we have now initiated IND-enabling activities for two iPS-derived CAR NK cell collaboration candidates. And we are actively working together with Janssen to prepare and submit IND applications for both of these candidates.
>
> For each of these collaboration candidates, Janssen maintains the option subject to its payment of an option fee prior to IND submission to initiate worldwide clinical development. We maintain the right in the U.S. alongside Janssen to co-commercialize and share equally in profits and losses of each collaboration candidate. As a reminder, under our collaboration, Janssen has the right to designate and contribute novel binding domains targeting up to four tumor-associated antigens. Janssen has now designated and contributed novel binding domains targeting three antigens. And we have now successfully achieved preclinical milestones for collaboration candidates targeting all three antigens.
>
> ***
>
> We are very pleased with the success we have achieved with Janssen and Ono in developing multiplexed-engineered iPS-derived CAR NK and CAR T cell product candidates for both liquid and solid tumors. And we are now poised to achieve significant milestones in connection with option exercised by Janssen and Ono over the course of the next three to six months.

140.   Also during the call, Defendant Dulac stated, in relevant part, that "[i]n the first quarter of this year, our collaboration revenue derived from our partnerships with

Janssen and Ono Pharmaceutical increased by $7.3 million to $18.4 million compared to $11.1 million for the same period last year."

### August 3, 2022 Press Release

141.   On August 3, 2022, Fate issued a press release that announced the Company's financial results for the second quarter of 2022, among other things. The press release stated the following, in relevant part:

> "[W]e continue to drive our collaborations with Janssen and Ono with strong momentum, and are well positioned to achieve significant milestones and advance three multiplexed-engineered, CAR-targeted cell collaboration candidates into clinical development over the next 12 months."

***

142.   Regarding the highlights from the Company's collaboration with Janssen, the press release stated the following in relevant part.

### Janssen Collaboration Highlights

**Clinical Development Option Exercised for First Antigen Program**. In May, Janssen exercised its commercial option for an iPSC-derived CAR NK cell collaboration product targeting an antigen expressed on certain hematologic malignancies, triggering a milestone payment to the Company. The Company expects to submit its first IND application under the collaboration during the second half of 2022. Pursuant to its commercial option exercise, Janssen has an exclusive license for development and commercialization of the product candidate, and the Company is eligible to receive clinical, regulatory, and commercial milestones, plus double-digit royalties on worldwide commercial sales of the product candidate. In addition, the Company retains the right to elect to co-commercialize, and share equally in profits and losses, in the United States, subject to its payment of certain clinical development costs and adjustments in milestone and royalty payments.

**Preclinical Development Ongoing for Two Additional Antigen Programs**. The Company and Janssen are also conducting preclinical development of a second iPSC-derived, CAR-targeted cell candidate for an antigen expressed on certain hematologic malignancies and a third iPSC-derived, CAR-targeted cell candidate for an antigen expressed on solid

tumors. In addition, during the second quarter, Janssen selected a solid tumor-associated antigen as its fourth and final program for initiation of candidate development.

*August 3, 2022 Conference Call*

143. Also on August 3, 2022, Fate held a conference call with analysts and investors to discuss the Company's financial results for the second quarter of 2022. During the call, Defendant Wolchko stated the following, in relevant part:

> During the second half of 2022, we expect to present new preclinical data for our ADR technology and highlight its integration into a next generation NK cell product candidate. Turning to our collaborations with Janssen and Ono. We continue to show strong momentum in bringing multiplexed engineered IPS-derived CAR NK and CAR-T cell collaboration programs to patients for the treatment of hematologic malignancies and solid tumors. And we are reaching key inflection points where multiple candidates are poised to advance towards IND submission. Under our collaboration with Janssen, entered into in April 2020, Janssen designated and contributed novel binding domains targeting 4 tumor-associated antigen programs, two of which are directed to hematologic malignancies and two of which are directed to solid tumors. Jansen maintains the option, subject to its payment of an option exercise fee prior to IND submission to initiate worldwide clinical development of and to commercialize collaboration products under each antigen program.
>
> We maintain an opt-in right to co-commercialize and share equally in profits and losses of collaboration products in the U.S. under each antigen program. In May, Janssen exercised its option on a first antigen program, triggering a $10 million payment to fee, and we have now advanced a second antigen program to the stage of option exercise decision. We are currently working with Janssen to prepare and submit 2 IND applications: one for each of these two antigen programs for off the-shelf iPS-derived CAR NK cell collaboration products.
>
> ***
>
> We are very pleased with the success we've achieved with Janssen and Ono in developing multiplexed engineered IPS-derived CAR NK and CAR-T cell product candidates for both liquid and solid tumors. We are poised to achieve significant milestones in connection with option exercises by

Janssen and Ono and advance multiple collaboration products toward IND submission over the next 6 months.

144.   Also during the call, Defendant Dulac stated, in relevant part, that "[i]n the second quarter of this year, our collaboration revenue derived from our partnerships with Janssen and Ono Pharmaceutical increased by $5.1 million to $18.5 million compared to $13.4 million for the same period last year."

### November 3, 2022 Press Release

145.   On November 3, 2022, Fate issued a press release that announced the Company's financial results for the third quarter of 2022, among other things. The press release stated, in relevant part, that "[r]evenue was $15.0 million for the third quarter of 2022, which was derived from the Company's collaborations with Janssen and ONO." The press release further stated, in relevant part:

> "[U]nder our collaboration with Janssen, we are pleased to announce our first IND candidate FT555, a multiplexed-engineered, iPSC derived CAR NK cell targeting GPRC5D for multiple myeloma, and that Janssen has also exercised its commercial option to an additional product candidate targeting an undisclosed hematologic malignancy antigen."

***

### Janssen Collaboration Highlights

**FT555 IND Candidate from GPRC5D Antigen Program for MM to be Presented at ASH**. In May, Janssen exercised its commercial option to FT555, a multiplexed-engineered, iPSC derived CAR NK cell product candidate targeting GPRC5D, a tumor-associated orphan G-protein-coupled receptor found to be highly expressed on myeloma cells. The companies will jointly present preclinical data at ASH demonstrating that administration of FT555 resulted in robust tumor growth inhibition in vivo in a disseminated xenograft mouse model comprised of engrafted MM.1S cells, and that the durability of tumor growth inhibition as well as survival were further enhanced in combination with daratumumab to simultaneously co-target GPRC5D and CD38 antigens.

**Commercial Option Exercised for Second Hematologic Malignancy Product Candidate**. In September, Janssen exercised its commercial option,

54

subject to Hart-Scott-Rodino regulatory clearance, to a second multiplexed-engineered, iPSC  derived CAR NK cell product candidate, which targets an undisclosed antigen expressed on certain blood cancers. The Company expects to submit an IND application for the product candidate under the collaboration during the fourth quarter of 2022.

**Preclinical Development Ongoing for Two Solid Tumor Antigen Programs**. The companies will jointly present preclinical data at SITC of an iPSC-derived CAR T-cell program targeting human kallikrein-related peptidase 2 (KLK2), an antigen with prostate-restricted expression that is maintained during prostate cancer progression. Preclinical data demonstrate that iPSC-derived CAR T cells targeting KLK2 have the potential to infiltrate the tumor mass and eliminate tumor cells in a highly-selective manner and to prolong survival in xenograft models of prostate cancer. In addition, during the third quarter, Janssen selected an undisclosed solid tumor-associated antigen as its fourth and final antigen program for initiation of product candidate development.

### November 12, 2022 Investor Presentation

146.   On November 12, 2022, Fate gave a presentation to investors regarding the Company's programmed cellular immunotherapies for treating cancer. During the presentation, Fate emphasized the Collaboration Agreement and particularly highlighted Janssen's relationship with Johnson & Johnson and the "Significant Economics" of the Collaboration Agreement, including "[that] Janssen pays for all collaboration costs" and "$3+ billion in milestones, double-digit royalties."

### December 10, 2022 Press Release

147.   On December 10, 2022, Fate issued a press release titled, "Fate Therapeutics Highlights iPSC-derived, Off-the-shelf CAR NK Cell Programs for Multiple Myeloma at 2022 ASH Annual Meeting." The press release stated the following, in relevant part:

> ***Preclinical Data under Janssen Collaboration with FT555 GPRC5D-targeted Product Candidate Demonstrate Robust and Durable Tumor Clearance in Highly Aggressive Myeloma Model***
>
> ***
>
> **FT555 GPRC5D-targeted CAR NK Cell Program**

Under its collaboration with Janssen Biotech, Inc. (Janssen), one of the Janssen Pharmaceutical Companies of Johnson & Johnson, the Company is currently conducting preclinical development of FT555, a multiplexed-engineered CAR NK cell product candidate derived from a clonal master engineered iPSC line incorporating four functional components: a proprietary CAR optimized for NK cell biology that targets GPRC5D, an orphan G-protein-coupled receptor expressed on myeloma cells with a distribution that is similar to but independent of BCMA; a novel hnCD16 Fc receptor for enhanced ADCC; an IL-15 receptor fusion (IL-15RF) that augments NK cell activity; and the deletion of the CD38 gene (CD38KO), which promotes persistence and function in high oxidative stress environments.

At ASH, scientists from the companies jointly presented preclinical data demonstrating that single-dose administration of FT555 as monotherapy resulted in robust and durable antigen-mediated tumor regression in two independent disseminated tumor models of aggressive myeloma, which activity was further improved in combination with daratumumab to simultaneously target GPRC5D and CD38 antigens. Administration of three doses of FT555 as monotherapy further improved tumor clearance and showed superior activity compared to single-dose primary CAR T cells.

In May 2022, Janssen exercised its commercial option to FT555, pursuant to which the Company granted Janssen an exclusive license for development and commercialization of FT555. The Company is eligible to receive clinical, regulatory, and commercial milestones, plus double-digit royalties on worldwide commercial sales of the product candidate. In addition, the Company retains the right to elect to co-commercialize, and share equally in profits and losses, in the United States, subject to its payment of certain clinical development costs and adjustments in milestone and royalty payments.

148. The statements identified in ¶¶ 99, 101-110, 112-114, 116, 122-125, 128, 130, and 138-147 were materially false and misleading and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Collaboration Agreement was far less viable than Fate had represented to investors and the public; (2) consequently, several of the clinical programs, milestone payments, and royalty payments

pertaining to the Collaboration Agreement could not be expected to provide future revenue sources for Fate; (3) as a result, Fate exaggerated the Collaboration Agreement's overall long-term medical and economic benefits; and (4) due to the aforementioned conduct, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Emerges**

149.   On January 5, 2023, after market hours, Fate issued a press release wherein it announced the Company had terminated the Collaboration Agreement. In particular, the press release stated, in relevant part:

> Fate [. . .] announced today that it has declined a proposal from Janssen Biotech, Inc. ("Janssen") for continuation of the collaboration and option agreement between the parties on revised terms and conditions and, as a result, the agreement has been terminated and all collaboration activities will be wound down in the first quarter of 2023. In addition, the Company has completed a strategic review of its natural killer (NK) cell product pipeline and has elected to focus on advancing its most innovative and differentiated programs, which have a multiplexed-engineered cellular framework of novel synthetic controls designed to promote multi-antigen targeting, increase potency, extend functional persistence, and enable patient dosing with reduced conditioning chemotherapy. The Company ended the fourth quarter with approximately $475 million in cash, cash equivalents, and receivables and, based on its pipeline prioritization and expense reduction, the Company expects to have sufficient financial resources through the end of 2025 to capitalize on its iPSC-derived chimeric antigen receptor (CAR) NK and CAR T-cell programs.
>
> "We are disappointed that we were not able to align with Janssen on their proposal for continuation of our collaboration, where two product candidates targeting high-value, clinically-validated hematology antigens were set to enter clinical development in 2023," said Scott Wolchko, President and Chief Executive Officer of Fate Therapeutics. "As a consequence, in keeping with the Company's commitment to develop disruptive product candidates, programs and technologies with the potential to address large, unmet clinical needs, we have prioritized our clinical programs and substantially reduced operating expenses, including taking the difficult and

painful step of reducing our workforce, to ensure that we have a three-year cash runway. We are greatly saddened to move in this direction as our employees have continually demonstrated the highest level of dedication and commitment in pioneering iPSC-derived cell therapy for patients with cancer. I want to extend my deepest appreciation to all of our employees for their tremendous efforts and wish those employees who will be departing great success in the future."

\*\*\*

***Wind Down of Janssen Collaboration***

During the fourth quarter of 2022, the FDA allowed an IND application for a first collaboration product for the treatment of B-cell lymphoma, for which the Company expects to receive a $3 million milestone payment, and Janssen exercised its second commercial option for a collaboration product, for which the Company expects to receive a $10 million milestone payment. As a result of the collaboration's termination, during the first quarter of 2023, the Company will wind down its activities with Janssen, including discontinuing development of all collaboration products, at the expense of Janssen. As a result of such termination, all licenses and other rights granted pursuant to the agreement terminate; neither party has any right to continue to develop, manufacture or commercialize any collaboration product or use the other party's materials; and neither party is restricted from independently developing, manufacturing, or commercializing any product, including any product directed to any antigen targeted by a collaboration product.

150.   On this news, the price per share of the Company's common stock dropped $6.76, or 61.45%, from a closing of $11.00 per share on January 5, 2023 to close on January 6, 2023 at $4.24 per share.

## DAMAGES TO FATE

151.   As a direct and proximate result of the Individual Defendants' misconduct, Fate has lost and expended, and will continue to lose and expend, many millions of dollars.

152.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of the Individual

Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

146. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including funds dispersed pursuant to the Plan.

147. As a direct and proximate result of the Individual Defendants' conduct, Fate has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

153. Plaintiff brings this action derivatively and for the benefit of Fate to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Fate, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

154. Fate is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

155. Plaintiff is, and has continuously been at all relevant times, a shareholder of Fate. Plaintiff will adequately and fairly represent the interests of Fate in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

156. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

157.   A pre-suit demand on the Board is futile and, therefore, excused. At the time this suit was filed, the Board was comprised of ten members: Defendants Wolchko, Rastetter, Epstein, Xu, Mendlein, Hershberg, Agarwal, Jooss, Coughlin, and Lee (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of ten Director-Defendants who are on the Board at the time this action is commenced.

158.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, while at least six of them engaged in insider sales based on material non-public information. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

159.   Moreover, Defendants Wolchko, Rastetter, Mendlein, Coughlin, Epstein, Hershberg, Lee, Jooss, and Agarwal solicited the 2021 Proxy Statement to call for a shareholder vote to, *inter alia*, elect Defendants Hershberg, Lee, and Rastetter to the Board, thus allowing them to continue breaching their fiduciary duties to Fate.

160.   Moreover, each Director-Defendant solicited the 2022 Proxy Statement which, *inter alia*, called for shareholders to approve the Plan, which also provided for an additional 9,500,000 shares to be issued in connection with approving the Plan. The misrepresentations and omissions set forth herein were material to shareholders in voting on approval of the Plan who would not have approved the Plan had they been informed about the wrongdoing alleged herein. Under the Plan, the total annual compensation paid to any non-employee director, inclusive of cash compensation and amounts awarded under the Plan, shall not exceed $1,000,000, except that in the case of the non-employee director's initial election or appointment to the Board, such limit is instead $1,500,000 for that calendar year. However, as mentioned above, for the 2021 Fiscal Year, Director-Defendants Rastetter, Mendlein, Coughlin, Epstein, Hershberg, Lee, Jooss, Agarwal, and

Xu received $466,049, $442,049, $445,549, $441,549, $435,174, $430,549, $436,299, $440,924, and $811,840, respectively, in total compensation. Because Director-Defendants Rastetter, Mendlein, Coughlin, Epstein, Hershberg, Lee, Jooss, Agarwal, and Xu solicited approval for the Plan which, *inter alia*, could have nearly doubled their total annual compensation (and for Defendant Xu, could have increased it by nearly a quarter), demand is futile as to them and, thus, excused. Indeed, as noted above, the Director-Defendants' total compensation for the 2022 Fiscal Year exceeded the amounts they received during the 2021 Fiscal Year in the form of ~$20,000 additional worth of stock awards after shareholders voted to approve the Plan that they would not have received without shareholder approval (based on the false and misleading statements and omissions contained in the 2022 Proxy Statement).

161. Defendants Coughlin, Jooss, and Xu (the "Compensation Committee Directors") served as members of the Compensation Committee during the Relevant Period. The Compensation Committee Directors solicited shareholder approval of the Plan, which granted them the right to determine how many shares of Company common stock to administer under the Plan to non-employee directors, including themselves. They all stood to benefit from, and did benefit from, shareholder approval of the Plan, which Company shareholders were deceived into approving while the Individual Defendants made false and misleading statements regarding the Company's operations and prospects. Thus, non-employee Director-Defendants Rastetter, Mendlein, Epstein, Hershberg, Lee, and Agarwal were beholden to the Compensation Committee Directors, and the Compensation Committee Directors were beholden to each other, because they would not take action against the very directors who held the authority to award them nearly double (for Defendant Xu, increase by nearly one quarter), their total annual compensation pursuant to the Plan. These conflicts of interest precluded the Compensation Committee Directors and the rest of the Director-Defendants from calling into question the Director-

Defendants and other Individual Defendants' conduct. Thus, demand upon the Compensation Committee Directors would be futile.

162.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly made and/or caused the Company to make the materially false and misleading statements alleged herein. Specifically, the Director-Defendants caused Fate to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

163.   Additional reasons that demand on Defendant Wolchko is futile follow. Defendant Wolchko is Fate's CEO/President and one of its directors and has served in these positions since December 2015 and October 2015, respectively. Thus, as the Company admits, Defendant Wolchko is a non-independent director. The Company provides Defendant Wolchko with his principal occupation for which he receives handsome compensation. As CEO, President and a director throughout the Relevant Period, Defendant Wolchko was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including those contained in the SEC filings and press releases referenced herein, including the 2020 10-K and the 2021 10-K, which he personally made statements in or signed. Further, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the Plan. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously

disregarded his duties to protect corporate assets.  In addition, Defendant Wolchko's insider sales, which yielded approximately $45,849,544 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Wolchko is a defendant in the Securities Class Action.  For these reasons, Defendant Wolchko breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.   Additional reasons that demand on Defendant Rastetter is futile follow. Defendant Rastetter has served as Chairman of the Board and as a Company director since November 2011. He also serves as a member of the Audit Committee. He has received and continues to receive lavish compensation as described above. He signed, or had signed on his behalf, the 2021 10-K and the 2022 10-K, which each contained false and misleading statements. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Rastetter breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165.   Additional reasons that demand on Defendant Epstein is futile follow. Defendant Epstein has served as a Company director since March 2014. He also serves as the chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. He has received and continues to receive lavish compensation as described above. He signed, or had signed on his behalf, the 2021 10-K and the 2022 10-K, which each contained false and misleading statements. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that

contributed, *inter alia*, to shareholders reelecting several Director-Defendants to the Board and approving the Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.. For these reasons, Defendant Epstein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.   Additional reasons that demand on Defendant Xu is futile follow. Defendant Xu has served as a Company director since August 2021. He also serves as a member of the Compensation Committee. He has received and continues to receive lavish compensation as described above. He signed, or had signed on his behalf, the 2022 10-K, which contained false and misleading statements. In addition, he solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting several Director-Defendants to the Board and approving the Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Xu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167.   Additional reasons that demand on Defendant Mendlein is futile follow. Defendant Mendlein has served as a Company director since April 2008. He also serves as a member of the advisory Science & Technology Committee. He has received and continues to receive lavish compensation as described above. He signed, or had signed on his behalf, the 2021 10-K and the 2022 10-K, which each contained false and misleading

statements. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting several Director-Defendants to the Board and approving the Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Mendlein's insider sales, which yielded approximately $1,139,069 in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, Defendant Mendlein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.  Additional reasons that demand on Defendant Hershberg is futile follow. Defendant Hershberg has served as a Company director since May 2020. He also serves as a member of the Nominating and Corporate Governance Committee and as a member of the advisory Science & Technology Committee. He has received and continues to receive lavish compensation as described above. He signed, or had signed on his behalf, the 2021 10-K and the 2022 10-K, which each contained false and misleading statements. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Hershberg's insider sale, which yielded approximately $15,288 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, Defendant Hershberg breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.   Additional reasons that demand on Defendant Agarwal is futile follow. Defendant Agarwal has served as a Company director since July 2019. She also serves as a member of the Nominating and Corporate Governance Committee and as a member of the advisory Science & Technology Committee. She has received and continues to receive lavish compensation as described above. She signed, or had signed on her behalf, the 2021 10-K and the 2022 10-K, which each contained false and misleading statements. In addition, she solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board and approving the Plan. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Agarwal's insider sales, which yielded approximately $36,808 in proceeds, demonstrate her motive in facilitating and participating in the fraud. For these reasons, Defendant Agarwal breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

170.   Additional reasons that demand on Defendant Jooss is futile follow. Defendant Jooss has served as a Company director since March 2019. She also serves as the chair of the Compensation Committee and as a member of the advisory Science & Technology Committee. She has received and continues to receive lavish compensation as described above. She signed, or had signed on her behalf, the 2021 10-K and the 2022 10-K, which each contained false and misleading statements. In addition, she solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting several Director-Defendants to the

Board and approving the Plan. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Jooss's insider sale, which yielded approximately $33,842 in proceeds, demonstrates her motive in facilitating and participating in the fraud. For these reasons, Defendant Jooss breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

171.   Additional reasons that demand on Defendant Coughlin is futile follow. Defendant Coughlin has served as a Company director since August 2013. He also serves as the chair of the Audit Committee and as a member of the Compensation Committee. He has received and continues to receive lavish compensation as described above. He signed, or had signed on his behalf, the 2021 10-K and the 2022 10-K, which each contained false and misleading statements. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Coughlin's insider sale, which yielded approximately $32,823 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, Defendant Coughlin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172.   Additional reasons that demand on Defendant Lee is futile follow. Defendant Lee has served as a Company director since July 2018. He also serves as a

member of the advisory Science & Technology Committee. He has received and continues to receive lavish compensation as described above. He signed, or had signed on his behalf, the 2021 10-K and the 2022 10-K, which each contained false and misleading statements. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Lee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.   Additional reasons that demand on the Board is futile follow.

174.   Defendants Coughlin, Rastetter, and Epstein (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, the performance of the Company's internal audit function, and the Company's compliance with applicable laws and regulations. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

175.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false

and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, violations of the Exchange Act, and for contribution under Sections 10(b) and 21D of the Exchange Act. Moreover, in violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

176.   Fate has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Fate any part of the damages Fate suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

177.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants faces a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

178.   The acts complained of herein constitute violations of fiduciary duties owed by Fate's officers and directors, and these acts are incapable of ratification.

179.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors'

and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Fate. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Fate, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

180.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Fate to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

181.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

182.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in

contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

184.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

185.   Under the direction and watch of the Director-Defendants (who sat on the Board during the time periods in question), the 2021 Proxy Statement and 2022 Proxy Statement (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Collaboration Agreement was far less viable than Fate had represented to investors and the public; (2) consequently, several of the clinical programs, milestone payments, and royalty payments pertaining to the Collaboration Agreement could not be expected to provide future revenue sources for Fate; (3) as a result, Fate exaggerated the Collaboration Agreement's overall long-term medical and economic benefits; and (4) due to the aforementioned conduct, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

186.   Moreover, the Proxy Statements were false and misleading when both discussed the Company's adherence to specific governance policies and procedures, including the responsibilities of the Board of Directors and the Audit Committee Charter, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

187.   Defendants Wolchko, Rastetter, Mendlein, Coughlin, Epstein, Hershberg, Lee, Jooss, and Agarwal knew or recklessly disregarded that by misrepresenting or

failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of directors.

188.   Defendants Wolchko, Rastetter, Mendlein, Coughlin, Epstein, Hershberg, Lee, Jooss, Agarwal, and Xu knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of directors and approval of the Plan, which provided (and provides) material benefits to them and certain of the other Individual Defendants.

189.   The false and misleading elements of the 2021 Proxy Statement led Company shareholders to, *inter alia*: (1) elect Defendants Hershberg, Rastetter, and Lee to the Board, allowing them to continue breaching their fiduciary duties to the Company and (2) approve the amendment and restatement of the Company's Amended and Restated Certificate of Incorporation to increase the authorized number of shares of common stock from 150,000,000 to 250,000,000.

190.   The false and misleading elements of the 2022 Proxy Statement led Company shareholders to, *inter alia*: (1) elect Defendants Coughlin, Wolchko, and Agarwal to the Board, allowing them to continue breaching their fiduciary duties to the Company and (2) approve the Plan, which, among other things, would provide for an additional 9,500,000 shares of Company common stock in connection with eligible awards to be received by the Company's directors and officers.

191.   The Company was damaged as a result of Defendants Wolchko, Rastetter, Mendlein, Coughlin, Epstein, Hershberg, Lee, Jooss, and Agarwal's material

misrepresentations and omissions in the 2021 Proxy Statement. The Company was damaged as a result of Defendants Wolchko, Rastetter, Mendlein, Coughlin, Epstein, Hershberg, Lee, Jooss, Agarwal, and Xu's material misrepresentations and omissions in the 2022 Proxy Statement.

192.   Plaintiff, on behalf of Fate, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of their Fiduciary Duties

193.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Fate's business and affairs.

195.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

196.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Fate.

197.   In breach of their fiduciary duties owed to Fate, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Collaboration Agreement was far less viable than Fate had represented to investors and the public; (2) consequently, several of the clinical programs, milestone payments, and royalty payments pertaining to the Collaboration Agreement could not be expected to provide future revenue sources for Fate; (3) as a result, Fate exaggerated the Collaboration

Agreement's overall long-term medical and economic benefits; and (4) due to the aforementioned conduct, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

198.   The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

199.   In breach of their fiduciary duties, at least seven of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

200.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain effective disclosure controls and procedures and internal controls.

201.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Fate's securities and disguising insider sales.

202.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless

disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Fate's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent them from continuing to occur.

203.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

204.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Fate has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

205.   Plaintiff on behalf of Fate has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Unjust Enrichment**

206.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Fate.

208.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Fate that was tied to the performance or artificially inflated valuation

of Fate, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

209.   Plaintiff, as a shareholder and a representative of Fate, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

210.   Plaintiff, on behalf of Fate, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

211.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Fate, for which they are legally responsible.

213.   As a direct and proximate result of the Individual Defendants' abuse of control, Fate has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Fate has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.   Plaintiff, on behalf of Fate, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

215.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary

duties with regard to prudently managing the assets and business of Fate in a manner consistent with the operations of a publicly-held corporation.

217.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Fate has sustained and will continue to sustain significant damages.

218.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

219.   Plaintiff, on behalf of Fate, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

220.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

222.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Fate to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company.

223.   As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

224.   Plaintiff, on behalf of Fate, has no adequate remedy at law.

Verified Shareholder Derivative Complaint

## SEVENTH CLAIM

**Against Defendants Wolchko and Dulac for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

225.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226.   Fate and Defendants Wolchko and Dulac are named as defendants in the Securities Class Action which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Wolchko and Dulac's willful and/or reckless violations of their obligations as officers and/or directors of Fate.

227.   Defendants Wolchko and Dulac, because of their positions of control and authority as CEO and CFO of Fate, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Fate, including the wrongful acts complained of herein and in the Securities Class Action.

228.   Accordingly, Defendants Wolchko and Dulac are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

229.   As such, Fate is entitled to receive all appropriate contribution or indemnification from Defendants Wolchko and Dulac.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Fate, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided

and abetted the breach of their fiduciary duties to Fate;

(c)     Determining and awarding to Fate the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Fate and the Individual Defendants to take all necessary actions to reform and improve Fate's corporate governance and internal procedures to comply with applicable laws and to protect Fate and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Fate to nominate at least four candidates for election to the Board;

3. a provision to eliminate the staggered, class-based director election and director term-length system; and

4. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Fate restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: June 2, 2023

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

DocuSign Envelope ID: E78C0FA0-0615-47C4-9FED-77833EA28F65

## **VERIFICATION**

I, Barney Guarino am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __th day of _____, 2023.

5/19/2023

_Barney Guarino_
DocuSigned by:
D12BA480AD794B2...
Barney Guarino